FILED

2017 Mar-14  AM 11:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| DONNA COMPTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 6:15-cv-2126-TMP |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

### Introduction

The plaintiff, Donna Compton, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Ms. Compton timely pursued and exhausted her administrative remedies, and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Ms. Compton was 49 years old at the time of the Administrative Law Judge's ("ALJ") decision, and she has a GED and a licensed practical nurse ("LPN") certificate. (Tr. at 64). Her past work experiences include working as an office

assistant and clinical nurse at a neurologists' office.   (Tr. at 64 - 65).   Ms. Compton claims that she became disabled on March 5, 2012, due to chronic obstructive pulmonary disease ("COPD"),[1] acute renal failure, hypokalemia,[2] tuberculosis, degenerative disc disease, and arthritis.   (Tr. at 47, 187).   She further asserts that she has probable granulomas in both lungs,[3] attention deficit disorder ("ADD"), attention deficit hyperactivity disorder ("ADHD"), irritable bowel syndrome, uncontrolled high blood pressure, depression, and anxiety.     (Tr. at 48).

When evaluating the disability of individuals over the age of eighteen, the regulations prescribe a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).  The first step requires a determination of whether the claimant is "doing

---

[1]     The Mayo Clinic website notes that most patients with COPD have "mild forms of the disease for which little therapy is needed other than smoking cessation." http://www.mayoclinic.org/diseases-conditions/copd/diagnosis-treatment/treatment/txc-2020493. The website further notes that the "most essential step in any treatment plan for COPD is to stop all smoking."

[2]     Hypokalemia refers to a lower than normal level of potassium in the bloodstream. www.mayoclinic.org/symptoms/low-potassium/basics/definition/sym-20050632.

[3]     Granulomas are nodules or calcifications caused by inflammation, and the inflammation may have been caused by tuberculosis that is now inactive or dormant. Granulomas do not usually require treatment unless the granuloma is "severe or producing symptoms."                        news.cancerconnect.com/what-is-a-lung-granuloma; www.medicinenet.com/script/main/art.asp?articlekey+8908.

substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If she is, the claimant is not disabled and the evaluation stops. *Id*. If he or she is not, the Commissioner next considers the effect of all of the claimant's physical and mental impairments combined. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). These impairments must be severe and must meet the durational requirements before a claimant will be found to be disabled. *Id*. The decision depends upon the medical evidence in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971). If the claimant's impairments are not severe, the analysis stops. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Otherwise, the analysis continues to step three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairments fall within this category, she will be found disabled without further consideration. *Id.* If they do not, a determination of the claimant's residual functional capacity ("RFC") will be made, and the analysis proceeds to the fourth step. 20 C.F.R. §§ 404.1520(e), 416.920(e). Residual functional capacity is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a).

The fourth step requires a determination of whether the claimant's impairments prevent her from returning to past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant can still do her past relevant work, the claimant is not disabled and the evaluation stops. *Id.* If the claimant cannot do past relevant work, then the analysis proceeds to the fifth step. *Id.* Step five requires the court to consider the claimant's RFC, as well as the claimant's age, education, and past work experience, in order to determine if she can do other work. 20 C.F.R. §§ 404.1520(a)(4)(v)416.920(a)(4)(v). If the claimant can do other work, the claimant is not disabled. *Id.* The burden of demonstrating that other jobs exist which the claimant can perform is on the Commissioner; and, once that burden is met, the claimant must prove her inability to perform those jobs in order to be found to be disabled. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

Applying the sequential evaluation process, the ALJ found that Ms. Compton has not been under a disability within the meaning of the Social Security Act from the date of onset (March 5, 2012) through the date of his decision. (Tr. at 52-53). He first determined that Ms. Compton has not engaged in substantial gainful activity since March 5, 2012, the date of her alleged onset. (Tr. at 47). At the second step

4

of the analysis, the ALJ found that the plaintiff had medically determinable impairments of COPD, hypokalemia, tuberculosis, degenerative disc disease, arthritis, probable granulomas in both lungs, and ADD/ADHD. (*Id.*)  He further found that these impairments, considered alone and in combination, are not considered "severe."  (Tr. at 47-48).  The ALJ found Ms. Compton's statements concerning the intensity, persistence, and limiting effects of her symptoms to be "not entirely credible."  (Tr. at 49).  Accordingly, the ALJ did not move on to the third, fourth, or fifth steps of the analysis; the ALJ concluded his findings by stating that Plaintiff is not disabled under sections 216(i) and 223(d) of the Social Security Act. (Tr. at 53).

## Standard of Review

This court's role in reviewing claims brought under the Social Security Act is a narrow one.   The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied.  *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).   Substantial evidence is "more than a scintilla and is

such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004), quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997). The court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Id.* "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if this Court finds that the evidence preponderates against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400. No decision is automatic, however, for "despite this deferential standard [for review of claims] it is imperative that the Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987).

Moreover, failure to apply the correct legal standards is grounds for reversal.   *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## Discussion

Ms. Compton alleges that the ALJ's decision should be reversed and remanded because, she asserts, the ALJ incorrectly failed to find that her impairments were "severe" at Step Two of the sequential process, and thus failed to engage in the final three sequential steps of analysis.   Plaintiff further asserts that, had the final steps been considered, she would have been deemed disabled because she was not able to perform her past work or any other gainful work that is available within the economy.   (Doc. 14, p. 11).   Plaintiff asserts that her use of a nebulizer would prohibit her from working, relying upon the testimony of the vocational expert who opined at the hearing that unskilled work such as that the plaintiff might otherwise be able to do does not permit the use of a nebulizer.   The Commissioner argues that the plaintiff failed to meet her burden of proving she is disabled, and that the ALJ's decision was supported by substantial evidence.   (Doc. 18).

A.   *Medical History*

The evidence presented indicates that Ms. Compton's medical history was as follows as of the date of her hearing, February 7, 2014:

Ms. Compton was treated by Dr. Farouk Raquib for several years, beginning in 2008, primarily for "chronic lumbar pain," although her previous MRI had been "unremarkable."   (Tr. at 257-307; 367-69).   When she began to see Dr. Raquib in 2008, she reported that her pain level, evaluated on a scale of 1-10, was 6 at least in the past month, and 10 at the worst, with 8 as an average. (Tr. at 384-85).   She also stated in 2008 that her pain "completely interferes" with her "general activity," "normal work," and "ability to concentrate."   (Tr. at 385).   On June 7, 2008, Dr. Raquib noted that Ms. Compton was opioid dependent; even so, Dr. Raquib noted that she was functioning well.   (Tr. at 257, 265).   Later in 2008, Ms. Compton reported that she got complete relief from her pain with Percocet, and that she had no side effects from the medication.   (Tr. at 334-35).   Although the doctor noted that Ms. Compton had ADD, COPD, and some occasional wheezing, he appeared to prescribe only pain medication after March 2010, when he discontinued prescribing Ritalin for her ADD, based on his assessment that she was "functioning fairly well at present."   (Tr. at 294, see also Tr. at 279, 284).   Dr. Raquib further noted that Ms. Compton smoked heavily—two packs per day—in spite of being counseled to stop

8

smoking.   (*See, e.g.*, tr. at 307, 314, 316).   She received prescriptions for Oxycontin from Dr. Raquib through 2011, and frequently reported that her pain level was 8 or above.   (Tr. at 557, 559, 561).   On September 8, 2011, she reported that her pain level was a 0 "after meds."   (Tr. at 549).

In January of 2011, she saw Dr. Douglas Martin for stomach cramps and body aches.   At that visit she reported that she was on no medication except ibuprofen, and that her pain level was a 3.   She denied anxiety, depression, arthritis, joint pain, and back problems.   (Tr. at 424-25).   She told the doctor she smoked two packs of cigarettes per day.   (*Id.*)   Dr. Martin determined that she was completely independent in daily living and that her physical examination was essentially normal.

Medical records from the Guin Medical Clinic indicate she was treated there in September, October, and November of 2012 and was taking oxycodone for back pain and tendinitis in her hands, but she had no objective findings of limitations.   At that time she reported smoking 2 to 3 packs per day.   (Tr. at 438).   She apparently smoked for at least 30 years (tr. at 429), and continued to smoke until about a month before her hearing before the ALJ.   (Tr. at 66-67).

Until March of 2012, Ms. Compton worked as an LPN and office assistant. On March 5, 2012, when she was at working at Winfield Neurology[4] as an office clerk and clinic nurse, she did not feel well at work.   She lay down during her lunch break and fell asleep.   She was fired for sleeping on the job.   (Tr. at 65).   She had a fever on that day, was coughing up blood, and thought she had the flu.   (Tr. at 68). Her breathing got more difficult after that episode.   (Tr. at 66).   She looked for another job for some time after being terminated, and received unemployment compensation until it ran out in May 2013.   (Tr. at 80).   She told the ALJ that she would have worked during that time if there had been a job that she could do.

On March 26, 2012, less than a month after she lost her job, Ms. Compton was treated by Dr. Martin as a follow-up after having pneumonia.   She reported that she was not in any pain.   (Tr. at 428).   She reported that she was independent in her activities of daily living (ADLs).   (Tr. at 429).   She denied muscle weakness, stiffness, difficulty walking, depression, stress, and anxiety.   (Tr. at 430).   She was given a prescription for oxycodone.   (*Id.*)

---

[4]      It appears that Winfield Neurology is the same entity as Winfield Neurology Family Medicine, which is the clinic at which Dr. Raquib practiced and at which Ms. Compton was treated for her pain.   Her income information indicates that Dr. Raquib was her employer in 2012.   (Tr. at 179).

On May 29, 2013, the plaintiff was treated for vomiting and nausea, which the doctor attributed to withdrawal from opioids after she reported that she had not been able to afford her pain medication and had quit "cold turkey."   (Tr. at 450).   She was diagnosed with severe acute renal failure, but her creatinine level improved within two days and she was discharged on May 31, 2013.   (Tr. at 463).   She was given a chest x-ray, which was found to show "cardiac silhouette within normal limits" and "[n]o consolidation, pulmonary edema or pleural effusion," which led the doctor to determine that "[n]o acute pulmonary disease" was identified.   (Tr. at 470). [5]   She was hospitalized in June of 2013 for acute gastroenteritis and hypokalemia, and was discharged after two days of treatment.   Her doctor noted on discharge that "some of this could be withdrawls [sic] again. [S]he was dishonest with me yesterday about her opiate use.   [H]er drug screen came back [positive] and when confronted she admits to using it."   (Tr. at 510).

On July 30, 2013, the plaintiff was examined by Dr. Laura Lindsey, a state disability examiner.   In that examination, plaintiff essentially denied any medical problems at all.   Dr. Lindsey found plaintiff's respiration to be "clear without rales,

---

[5]     Additional medical records submitted to the Appeals Council from an x-ray taken September 25, 2012, also showed "no pulmonary edema, pneumothorax or pleural effusion identified."   (Tr. at 31).

rhonchi, or wheezing."   She found no pain upon palpition of the plaintiff's spine and that plaintiff had a "full range of motion."   (Tr. at 496)   Dr. Lindsey concluded that Ms. Compton "does not appear limited by her medical conditions."   (Tr. at 497).

Ms. Compton visited the emergency room at North Mississipi Medical Center in Hamilton, Alabama, on January 6, 2014, complaining of shortness of breath, cough, and congestion.   She was admitted, and was discharged two days later after being diagnosed with acute exacerbation of COPD, shortness of breath, smoker, tachycardia, and caffeinism.[6]   (Tr. at 537).   At that time she reported smoking about a half-pack per day.   She was discharged with orders to stop smoking, reduce her caffeine intake, and use a nebulizer every four hours.   She was also directed to schedule a follow-up in one week.   (Tr. at 539).   There is no record of any follow-up visit.   Her hearing was held about a month later, on February 7, 2014.

After her hearing with the ALJ, additional medical records were submitted that show the following:

---

[6]      Plaintiff reported that she drank 20-24 regular Mountain Dew soft drinks per day. (Tr. at 530).

Ms. Compton visited the emergency room in Hamilton again on April 6, 2014, where she was treated for pain in the back and kidney area.   At that visit, she was reported to be an "everyday smoker," smoking a half-pack per day.   She was discharged with a two-day treatment of Ultram (tramadol), a narcotic pain medication.   She went to the emergency room again on May 5, 2014, complaining of shortness of breath, and was diagnosed with acute bronchitis.   It was noted that she had been using the nebulizer every four hours.   (Tr. at 576-580).

Ms. Compton returned to the hospital on September 25, 2014, with complaints of chest pain.   The record indicates that at that time she was not using the nebulizer, as it was noted that "she is not currently taking any medication because she has been asymptomatic."   (Tr. at 15).   She was given a cardiac assessment the next day, and was found to have experienced non-cardiac chest pain and to be at "low risk" of any cardiac event.   (Tr. at 9).[7]

---

[7]      Although plaintiff asserts that Ms. Compton had been to the hospital "five times since March 2012" and "[e]ach time she has gone there she has had pneumonia," neither the plaintiff's testimony at the hearing nor the medical records support that statement in that none show a diagnosis of pneumonia.   (Doc. 14, p. 9, citing Tr. at 69-70).   Moreover, even recurring pneumonia does not necessarily support a finding that a claimant is disabled.

B.   *Assessment of Impairments as "Non-Severe"*

The plaintiff asserts that the ALJ improperly assessed her impairments as non-severe, and that his assessment is not supported by substantial evidence.   The Commissioner has responded that the plaintiff failed to demonstrate that her impairments "significantly limited" her ability to do basic work activities and had lasted for 12 months in duration.

The ALJ determined that Ms. Compton has impairments of COPD, hypokalemia, tuberculosis, degenerative disc disease, arthritis, probable granulomas in both lungs, and ADD/ADHD, but at the second step of the sequential analysis, he found that "the impairment or combination of impairments" did not "significantly limit" her ability to perform basic work, and could not be expected to significantly limit her ability to work.   (Tr. at 47).

The regulation governing the step two analysis states:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.   We will not consider your age, education, and work experience.

20 C.F.R. § 416.920(c).   It was at this step in the analysis that the ALJ found that Ms. Compton had failed to prove that any of her impairments was severe.   The sequential analysis requires that such a finding—a negative response to the second-step question—compels the conclusion that the claimant is not disabled.

The Eleventh Circuit Court of Appeals defined whether an impairment or combination of impairments may be deemed "severe" in *Brady v. Heckler*, 724 F.2d 914 (11th Cir. 1984).   The court held that an "impairment can be considered as 'not severe' only if it is a slight abnormality which has a minimal effect" such that it "would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."   724 F.2d at 920.   The court clarified the *Brady* standard in *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986), noting that the step-two analysis is a "threshold inquiry" and that only "claims based on the most trivial impairments" could be rejected.   800 F.2d at 1031.   The court explained that "[a]n impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."   *Id.* Moreover, the court is not permitted to evaluate the record and reach its own

determination regarding the remainder of the sequential steps if the ALJ has incorrectly applied the *Brady* standard.   800 F.2d at 1032.

The ALJ reached the conclusion that the impairments were non-severe without making any reference to *Brady*, but plaintiff does not complain that the court failed to apply the proper legal standard.[8]   Plaintiff's argument is that the conclusion that the impairments are non-severe is not supported by substantial evidence.[9] (Doc. 14, p. 9).

At first blush, it appears that a claimant with the impairments that are found within Ms. Compton's medical history must be severe.   However, a more careful examination of the record—as clearly was conducted by the ALJ—reveals that Ms. Compton's many impairments do not significantly limit her ability to work, and in fact only mildly limit her ability to perform basic work activities.   While this court is reluctant to affirm a finding that could be construed as a pronouncement that

---

[8]   This court must, and has here, however, conducted an "exacting examination" of the legal standard apply and the legal conclusions reached, as dictated by <u>Miles</u>, 84 F.3d at 1400.

[9]   Even if the plaintiff had argued that the ALJ failed to properly apply the *Brady* standard, she would not be entitled to any relief in that the ALJ did apply the language of the regulations in stating that the plaintiff's impairments did not "significantly limit" her ability to work.   The Eleventh Circuit Court of Appeals has determined that an opinion that employs the "significantly limits" standard and "is thorough and addresses the medical evidence in the record" is sufficient to support a conclusion that the ALJ applied the proper legal standard applicable to step two.   *Gray v. Commissioner of Soc. Sec.*, 426 Fed. Appx. 751, 753 (11th Cir. 2011).

COPD or tuberculosis is "slight" or "trivial," the record produced by the claimant in this case does provide substantial evidence for the ALJ's finding of non-severity. *See McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) (noting that severity is "measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality.")   A "mere diagnosis" is insufficient to establish severity.   *Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002).   *See also Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005).   Although a finding that "impairments are not severe is relatively unusual," an adverse finding by an ALJ is due to be affirmed where the decision is "sufficiently thorough and is supported by substantial evidence."   *Roberts v. Colvin*, 2015 WL 5116882 (N.D. Ala. Aug. 28, 2015). Based upon these standards, it does appear that the ALJ properly weighed the limiting effects of the claimant's conditions.[10]

---

[10]   Plaintiff's counsel finds fault with the ALJ's mention that Ms. Compton continued to smoke up until a short time before the hearing.  This fact, however, is relevant to both her credibility as to her difficulty in breathing, and to her failure to comply with doctor's instructions to stop smoking.

Ms. Compton's records reflect that she reported to the doctors whose records have been produced that she was diagnosed with COPD, although she frequently was examined and found to have no wheezing, no pulmonary edema, no pleural effusion, and no acute pulmonary disease.   On January 6, 2014, a chest x-ray was found to be normal.    Aside from her visit to the emergency room for acute bronchitis, she did not seek or receive treatment for the COPD.   While she complained generally of trouble breathing, the objective medical evidence does not substantiate that claim.   The plaintiff's argument that her COPD was severe is based upon her use of the nebulizer, but the medical records show that the nebulizer was first prescribed in January 2014, that she was using it as late as May 2014, but that she was no longer using the nebulizer in September 2014.   While use of the nebulizer may have been disabling for the short period during which she used it, the short-term nebulizer treatments for an acute ailment do not meet the durational requirements and do not support her entitlement to benefits.

The ALJ further found that the claimant suffered from hypokalemia, but noted that the kidney function returned to normal limits with two days of treatment.   The acute nature of this impairment further supports his conclusion that the hypkalemia is not severe.

The ALJ found that the plaintiff had not shown any evidence of tuberculosis since a 2009 test which showed "probable granulomas" but no active tuberculosis, and Ms. Compton did not seek or receive treatment for tuberculosis or the granulomas since that time.   Moreover, she continued to work for three years after that finding.

Ms. Compton's claims of arthritis and degenerative disc disease are poorly documented, with an absence of any x-rays or MRIs to substantiate the claims; however, it is clear that she consistently sought and received pain medication for the pain in her lower back.   Even so, Ms. Compton was able to work for several years while complaining of 8-10 level pain, reporting to her doctor that the narcotic pain medications (Percocet, and later Oxycontin or oxycodone, Vimpat, and Dilaudid) offered complete relief.   She does not assert that this pain could not still be adequately managed: she instead testified that she could not afford the doctor visits or medication costs.

Ms. Compton's final medically determinable impairment is her diagnosis of ADD/ADHD.   She apparently took Ritalin to manage this condition at some time, but she quit in 2010, when her doctor stopped prescribing it because she was

"functioning well."   There is no medical record that she ever, after that date, sought more treatment or medication for that impairment.

No treating doctor has ever opined that Ms. Compton is unable to work or to perform work-related functions.   The ALJ gave great weight to Laura Lindsey, M.D., a disability examiner, who found that Ms. Compton had no limitations from her medical conditions, and to Samuel Williams, M.D., who determined that she had no severe mental or physical impairments.   (Tr. at 51).   When viewed as a whole and over time, Ms. Compton's medical records indicate that she has several impairments, including COPD and chronic back pain, but that the pain can be alleviated with medication, and that the COPD does not usually impair her, except during a recent exacerbation which did not meet the durational limitations of the Social Security regulations.   There is no evidence that any of these conditions "significantly" interfere with her ability to perform basic work functions.

Substantial evidence supports the ALJ's determination that Ms. Compton's COPD, hypokalemia, tuberculosis, degenerative disc disease, arthritis, probable granulomas in both lungs, and ADD/ADHD were not "severe" impairments.   There is more than a scintilla of evidence in the records that Ms. Compton's ability to work

was not significantly limited over the long term.[11]    Accordingly, the ALJ's decision is based upon substantial evidence that the impairments had only a slight effect on her ability to perform work activities.

## Conclusion

Upon review of the administrative record, and considering all of Ms. Compton's arguments, the undersigned Magistrate Judge finds the Commissioner's decision is due to be and hereby is AFFIRMED.   A separate Order will be entered.

DONE this 14th day of March, 2017.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE

---

[11]    Plaintiff's counsel argues that her prescribed use of the nebulizer rendered her COPD "severe," and points to the vocational expert's testimony that employment would be precluded by a hypothetical employee who had to use a nebulizer every 4 hours.   However, the record showed that Ms. Compton, at the time of the hearing, had only used the nebulizer for a short period after an exacerbating episode, and the subsequently produced records show that the use of the nebulizer was discontinued a few months later.   Because the analysis stopped at the second step, and because Ms. Compton's use of the nebulizer was temporary, the vocational expert's testimony was superfluous.